**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

**TIFFANY M. CHEY**

        **PLAINTIFF,**

**v.**

**CHIEF EDWARD LABRUNO; CHIEF KIETH LICATA; SERGEANT MATTHEW FORTUNATO; SERGEANT CHRISTOPHER COUPE; AIDA CAHILL; THOMAS J. MAHONEY; THOMAS B. FOLEY; JOSEPH LANG; SCOTT HUTCHINS; BOROUGH OF MOUNT ARLINGTON; MUNICIPAL COURT OF MOUNT ARLINGTON/WHARTON BOROUGHS; TOWNSHIP OF MONTCLAIR NEW JERSEY; XYZ CORPS. 1-10; JOHN/JANE DOES DOES 1-10, SUED INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES**

        **DEFENDANTS**

Civ. No. 20-19036 (KM)(JBC)

**OPINION**

---

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Tiffany Chey asserts numerous constitutional and statutory claims against the Borough of Mount Arlington, New Jersey ("Mount Arlington"); several employees of the Mount Arlington Police Department ("MAPD"), including Chief Edward LaBruno, former Chief Keith Licata, Sergeant Matthew Fortunato, Sergeant Christopher Coupe (collectively, the "MAPD Defendants)"; the Municipal Arlington Municipal Court ("MAMC"); Aida Cahill, Thomas Mahoney, Scott Hutchins, Thomas Foley, Joseph Lang; and the Mount

Arlington Construction Department ("MACD"). The claims are asserted under both federal and New Jersey state law.[1]

Now before the Court is Defendants' motion (DE 26) to dismiss the Second Amended Complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, I will **GRANT** Defendants' motion to dismiss.

## I.    BACKGROUND

## A. Facts

The events giving rise to the instant action began in 2008, while Chey was employed by nonparty H.W. Farren, Inc. ("Farren"), which the 2AC characterizes as a "rigging company and government subcontractor." (2AC at ¶ 28.) While Chey was employed by Farren, she worked closely with nonparty Phillip J. Antonucci, Farren's "chief executive." (*Id.* ¶ 30.) Mr. Antonucci, who is married to nonparty Laura Antonucci, began a relationship with Chey and they "later became engaged." (*Id.* at ¶ 31.) Mr. Antonucci assisted Chey in acquiring her present residence in Mount Arlington. (*Id.* ¶ 32.)

In the Spring of 2011, Mrs. Antonucci discovered that her husband was engaged to Chey and allegedly texted Chey a "death threat." (*Id.* ¶ 34.) Chey broke off her engagement with Mr. Antonucci in March 2012. (*Id.* ¶ 35.) The 2AC claims that Chey feared a "violent response" from the Antonuccis, especially in light of the alleged "death threat" that Mrs. Antonucci had earlier

---

[1]    Citations to certain items in the record will be abbreviated as follows:

"DE" = Docket entry number in this case.

Compl. = Plaintiff's Complaint (DE 1)

Am. Compl. = Plaintiff's First Amended Complaint (DE 3)

2AC = Plaintiff's Second Amended Complaint (DE 25)

Mot. = Defendants' Brief in Support of Motion to Dismiss (DE 26-3)

Opp. = Plaintiff's Letter-Brief in Opposition to Defendants' Motion to Dismiss and in Support of Cross-Motion for Leave to File Third Amended Complaint (DE 33-1)

Reply = Defendants' Reply in Support of its Motion to Dismiss (DE 34)

texted Chey. (*Id.*) After Chey ended her relationship with Mr. Antonucci, she was "constructively discharged" from her employment with Farren and "blackball[ed]" from further employment in the "aircraft or logistics fields[.]" (*Id.* ¶ 36.)

Following Chey's "discharge" from Farren, she began working "in field sales for a local water softener company." (*Id.* ¶ 37.) On July 17, 2014, while working, Chey ran into Mrs. Antonucci. (*Id.* ¶ 37.) After that encounter, Chey purportedly "began to observe [that] she was being tailed and surveilled," including by a vehicle she had previously seen at the Antonucci residence. (*Id.* ¶ 38.) Chey also claims that she was followed by different vehicles, which often parked outside her home. (*Id.* ¶¶ 38-40.) Chey reported these alleged incidents to numerous law enforcement agencies, including the New Jersey State Police and MAPD. (*Id.* ¶ 42.) The 2AC asserts that MAPD "did not take [her] reports seriously" and "discouraged" Chey from identifying Mr. and/or Mrs. Antonucci in her complaints, "despite the strong, circumstantial evidence" of their involvement. (*Id.* ¶¶ 43-45.)

The alleged incidents culminated on November 25, 2014, when Chey "was attacked in her home … with a blunt instrument on [her] head and face," and "left for dead unconscious." (*Id.* ¶¶ 47-38.) Several days later, Chey reported the attack to MAPD, with Defendant Sergeant Fortunato taking numerous photographs of her injuries. (*Id.* 53-54.) These photographs, however, "have since disappeared," and MAPD has since denied that Chey ever "provided any contemporaneous evidence when she first reported the attack in 2015." (*Id.* ¶¶ 54-55.) According to Chey, MAPD's alleged failure to fully investigate the "attack" rendered the case "unsolvable" and resulted in MAPD "cover[ing] up its egregious failure" by: (1) "reporting the attack as 'unfounded'" and (2) defaming and dismissing Chey as "paranoid." (*Id.* ¶¶ 62.)

By 2019, Chey began to recall more details of the "attack"; as her memory returned, she also became "more aware of escalating surveillance and intrusions." (*Id.* ¶¶ 64 *et seq.*) Subsequently, Chey reported more alleged

incidents to MAPD, including: (1) her security systems being hacked; (2) her identity being stolen; (3) her passwords changed; (4) her internet and television cable being "swapped out"; (5) the streetlamp in front of her home being "shot out"; (6) an "electrical discharge" in her water supply; (7) a window air conditioning unit being "disabled by heavy objects"; (8) several holes being drilled in Chey's home; and (9) a retaining wall collapse which damaged Chey's automobile. (*Id.* ¶¶ 65-78.) MAPD purportedly took no action on Chey's complaints and routinely failed "to document the incidents accurately." (*Id.* ¶¶ 80-81.) Chey later obtained MAPD reports and claims that many of these reports described her "as 'paranoid' or suffering 'paranoia.'" (*Id.* ¶ 83.)

The 2AC also alleges that on December 14, 2019, Chey reported "an intruder in the side yard" of her home to MAPD. (*Id.* ¶ 84.) In response, nonparty Detective Ryan Caparoni arrived at Chey's home "with a paramedic crew and ambulance, stating in front of the paramedics that [Chey] is delusional, paranoid, [and] mentally ill … and in need of transportation for hospitalization." (*Id.* ¶ 85.) Chey, however, claims that she is "not, in fact, delusional, paranoid, or otherwise mentally impaired"; according to Chey, these statements by MAPD amount to "defamation *per se*" and were made to "justify [MAPD's] failure to … investigate[ ] a violent felony and probably conspiracy … against" her. (*Id.* ¶¶ 84-90.) Chey asserts that Mount Arlington and MAPD "have failed to hire and train properly officer in their duty to investigate reports of serious felonies" and have failed to "enact, enforce, and implement policies and procedures that would have either prevented the attack" on Chey or led to evidence that could have "brought the perpetrator(s) to justice." (*Id.* ¶¶ 92, 94.)

Because of these incidents, Chey has expressed "a legitimate desire and need for … a firearm for protection" and has applied for a New Jersey Firearms Purchaser Identification Card ("FPIC"), pursuant to N.J. Stat. Ann. § 2C:58-3(b). (*Id.* ¶ 114.) The 2AC alleges that a decision on Chey's FPIC application was inexplicably delayed by six-months. (*Id.* ¶ 116.) Thereafter, according to Chey, Chief LaBruno denied her application "without a word of explanation,"

on the pretextual justification that granting her an FPIC "would be incompatible with 'Public Health, Safety, and Welfare'." (*Id.* ¶¶ 116-117, 120.)

On the other hand, the 2AC states that Mr. Antonucci once gave Chey "a vintage Colt revolver" on her birthday, which she kept in her home "for almost a decade." (*Id.* ¶ 31.) On November 4, 2019, Chey alleges that nonparty Sergeant Matthew Green induced her to surrender the revolver for "safekeeping," after Green responded to Chey's report of "increased surveillance." (*Id.* ¶ 121.) Despite an assurance from then Chief Licata, on January 20, 2020, that she could retrieve the revolver "at any time," Chey alleges that her requests for the revolver's return have been ignored. (*Id.* ¶ 122.)

Finally, the 2AC alleges that on November 8, 2019, at around 2 am, Defendant Sergeant Coupe and another MAPD patrol officer arrived at Chey's home in response to a triggered intruder alarm. (*Id.* ¶ 125.) Chey claims that while "inspecting the lower" level of her home, Coupe unsecured "two deadbolts on French doors." (*Id.* ¶ 126.) The 2AC also asserts that Coupe told Chey "that her French doors were in a blind spot of her" security system"; Chey believes this demonstrates that Coupe "had been surveilling" her home for weaknesses "in its security systems." (*Id.* ¶ 129.)

**B. Procedural History**

Chey filed the initial complaint (DE 1) on December 12, 2020 and the First Amended Complaint (DE 3) on March 31, 2021. The currently operative 2AC (DE 25) was filed on November 9, 2021.[2] The 2AC appears to be bringing the following claims:

- Pursuant to Section 1983: (1) violation of procedural and substantive due process (Count 1); (2) unlawful search and seizure in violation of the Fourth Amendment (Count 1); (3) violation of the Equal Protection Clause of the Fourteenth Amendment (Count 1); (4) violation of the Takings Clause of the Fifth Amendment (Count 1); *Monell* liability against Mount Arlington (Count 3).

---

[2]     On March 10, 2022, Magistrate Judge James B. Clark issued a letter order (DE 38) denying Chey's motion for leave to file a Third Amended Complaint.

- Pursuant to the Racketeer and Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.: (1) civil RICO claim under 18 U.S.C. § 1964 (Count 11).

- Constitutional challenge of N.J. Admin. Code § 13:54-1.15 (Count 2).

- Pursuant to New Jersey state tort law: (1) civil conspiracy (Count 4 and 9); (2) defamation (Count 5); (3) false light (Count 6); (4) intentional infliction of emotional distress (Count 7); and (5) aiding and abetting liability (Count 10).

(*See* 2AC at ¶¶ 109-281.)

In addition to damages and costs, Count 8 of the 2AC seeks preliminary and permanent injunctive relief against "All Defendants." (*Id.* ¶¶ 249-258.)

On November 18, 2021, Defendants filed this motion to dismiss the 2AC in its entirety. (DE 26.) Chey filed a letter-brief in opposition to Defendants' motion and in support of her cross-motion for leave to file a Third Amended Complaint on December 20, 2021. (DE 33.) On December 23, 2021, Defendants filed a reply. (DE 34.) The motion is fully briefed and ripe for decision.

## II.   LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief.") (citation omitted). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Defendants, as the moving party, bear the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

## B. Preliminary Injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ferring*, 765 F.3d at 210 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The movant bears the burden of showing these four factors weigh in favor of granting the injunction, and a failure to establish any one factor will render a preliminary injunction inappropriate. *Id.*

## III.   DISCUSSION

### A. Federal Claims

I begin with the claims arising under federal law, because they are the sole asserted basis for this Court's subject matter jurisdiction.

#### 1. Section 1983 Claim (Count 1)

Count 1 of the 2AC brings federal constitutional claims against the MAPD Defendants. Chey appears to be asserting these claims under 42 U.S.C. § 1983, although the 2AC does not explicitly cite this provision. The Court construes the 2AC liberally and will analyze these claims under Section 1983.

Section 1983 "provides a remedy for the violation of federal rights created by federal law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995)[3]. To state a claim under Section 1983, Chey must allege (1) the deprivation of a federal right and (2) state action. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Here, the 2AC alleges violations of the Second, Fourth, and Fifth Amendments. (2AC at ¶¶ 109-130.)

### i.  *Denial of Chey's FPIC Application*

The 2AC alleges that Chief LaBruno, with the assistance of Sergeant Fortunato and former Chief Licata,[4] (1) purposely delayed rendering a decision on Chey's FPIC application for six months and (2) rejected her application on July 24, 2020, after being "[l]eft with no plausible excuse to delay further." (*Id.* ¶¶ 116-117.) Chey also claims that Chief LaBruno, nor any other MAPD employee, interviewed her prior to denying her FPIC application; this, Chey contends, is contrary to New Jersey precedent that requires "the applicable police agency to interview an [FPIC applicant] … if that agency is contemplating disapproval." (*Id.* ¶¶ 118-119.) Finally, the 2AC asserts that Chief LaBruno's denial on "Public Health, Safety, and Welfare" grounds was bereft of any explanation and merely pretextual. (*Id.* ¶ 120.) According to Chey, the MAPD

---

[3]   42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ….

[4]   The 2AC alleges that Licata served as MAPD Chief of Police through April 30, 2020. 2AC at ¶ 9. Thereafter, beginning on May 1, 2020, LaBruno took over Licata's position. *Id.* at ¶ 8.

Defendants' actions unlawfully interfered with her Second Amendment rights. (*Id.* ¶ 121.)

Defendants respond in relation to Chey's FPIC application denial that she had 30 days from the decision to appeal to the Superior Court pursuant to New Jersey law. (Mot. at 13; *see also* N.J. Ann. Stat. 2C58-3(d); N.J. Admin. Code 13:54-1.12.) Because Chey does not allege that she appealed her application denial, Defendants argue that she has failed to exhaust "her administrative remedies" and cannot "obtain federal review of her [Second Amendment] claim." (Mot. at 13. (citing *Ray v. Kertes*, 285 F.3d 287, 295 n.8 (3d Cir. 2002).)

To "receive, purchase, or otherwise acquire" a firearm in New Jersey, an individual must hold a valid FPIC, unless her or she is a licensed firearms dealer or is purchasing an "antique" rifle or a shotgun. N.J. Stat. Ann 2C:58-3(b)(1).[5] To obtain a FPIC, an individual must apply to the police chief for the municipality in which he or she resides, or if a non-resident, the county in which the application was filed. N.J. Stat. Ann. § 2C:58-3(d). If the police chief denies the application, the applicant may request a hearing before the local Superior Court within 30 days at no filing cost. *Id.*

N.J. Stat. Ann. § 2C:58-3 also governs who may purchase or possess a firearm. New Jersey law provides that "[n]o person of good character and good repute in the community in which he lives, and who is not subject to any of the

---

[5]   A firearm is defined as:

> [A]ny handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances. It shall also include, without limitation, any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

N.J. Stat. Ann. § 2C:39-1(f).

disabilities set forth in this section or other sections of this chapter, shall be denied a permit to purchase a handgun or a [FPIC], except as hereinafter set forth." N.J. Stat. Ann. § 2C:5-3(c). Subsection (c) enumerates several "disabilities" that would preclude an applicant from receiving a FPIC. In this instance, Chief LaBruno denied Chey's application pursuant to subsection (c)(5), which states that "[n]o handgun purchase or [FPIC] shall be issued to any person where the issuance would not be in the interest of the public health, safety or welfare."

Chey does not challenge the facial constitutionality of N.J. Stat. Ann. § 2C:5-3 or the constitutionality of the statute as-applied to her. Instead, the 2AC asserts that the procedures (or lack thereof) employed by Chief LaBruno in denying her FPIC application were unfair, and resulted in a deprivation of her Second Amendment rights or right to a firearms permit. I will therefore construe this challenge as one sounding in procedural due process.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Because the 2AC alleges wrongdoing by local actors, as opposed to federal actors, the Court addresses Chey's procedural due process claim under the Fourteenth Amendment. To plausibly state a procedural due process claim, Chey must establish that: (1) she had a property interest protected under the Fourteenth Amendment; and (2) the procedures provided to her were constitutionally inadequate. *See Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000) (citation omitted); *see also Alston v. Monmouth Cnty. Prosecutor's Off.*, No. CIV.A. 12-5633 FLW, 2014 WL 1095716, at *3 (D.N.J. Mar. 19, 2014). Thus, the threshold issue is whether a FPIC is a cognizable liberty or property interest protected by the Due Process Clause. *Hill v. Borough of Kutztown,* 455 F.3d 225, 234 (3d Cir. 2006); *see also Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Christie*, 850 F. Supp. 2d 455, 460 (D.N.J. 2012), *aff'd*, 707 F.3d 238 (3d Cir. 2013).

The Constitution itself does not create property interests. Instead, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement of those benefits.'" *Bd. Of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972); *see also Ass'n of New Jersey Rifle*, 850 F. Supp 2d at 460. The Court will therefore look to New Jersey law to determine whether Chey has a "legitimate claim of entitlement" to an FPIC.

Reviewing both case law and the statutory scheme governing FPICs, the Court does not find a holding that a FPIC is a constitutionally protected interest. One factor courts consider in determining whether an applicant has a "legitimate claim of entitlement" is the discretion invested in the official overseeing the claimed interest. *See Ass'n of New Jersey Rifle*, 850 F. Supp. 2d at 460; *Hain v. DeLeo*, 2010 WL 4514315, *6 (M.D. Pa. 2010). For example, in *Hain*, the court found that a license to carry firearms ("LCF") was not a protected property interest because the Pennsylvania Uniform Firearms Act, 18 Pa. Cons. Stat. Ann. § 6101 *et. seq.*, invested the local sheriff with discretion in issuing the LCFs. 2010 WL 4524315 at *6. Similarly, in *Association of New Jersey Rifle*, then Judge Pisano held that the broad discretion vested in New Jersey's Superintendent of the State Police as to issuing exemptions to New Jersey's "One Gun Law" precluded "a finding that an applicant ha[d] a 'legitimate claim of interest' in [the] Exemption." 850 F. Supp. 2d at 461.[6]

New Jersey law governing the issuance of FPICs similarly vests broad discretion to local officials. The New Jersey Supreme Court has expressed that

---

[6]     Under New Jersey's One Gun Law, "no more than one handgun" can be purchased within a 30-day period. N.J. Stat. Ann. § 2C:58-3(i). This limitation, however, is subject to various exceptions. One such exception, at issue in *Association of New Jersey Rifle*, pertained to "transaction[s] where the superintendent issues an exemption from the [One Gun] prohibition … pursuant to the provisions of [N.J. Stat. Ann. § 2C:58-3.4]." N.J. Stat. Ann. § 2C:58-3(i)(6); *see also Ass'n of New Jersey Rifle*, 850 F. Supp. 2d at 457.

the "function of the Police Chief as the local administrative official charged with responsibility for the original decision to grant or withhold the [FPIC] involves largely the exercise of an informal discretion." *Weston v. State,* 60 N.J. 36, 45 (N.J. 1972). Under N.J. Stat. Ann. § 2C:58-3(c), "[t]he chief of police of an organized full-time police department of the municipality where the applicant resides … shall upon application, issue to any person *qualified under the provisions of subsection c. … a permit to purchase a handgun or a [FPIC].*" (emphasis added.) Therefore, in order to assess whether an applicant falls within the specified "disabilities," a police chief must determine, for example, whether the applicant: (1) has been convicted of any crime, or [ ] disorderly offense involving domestic violence; (2) is a "drug-dependent person," currently "confined for a mental disorder to a hospital, mental institution or sanitarium," or is "a habitual drunkard"; or (3) "suffers from a physical defect or disease" that renders it unsafe for the applicant to handle a firearm. N.J. Stat. Ann. § 2C:58-3(c)(1)-(3).

Moreover, under N.J. Stat. Ann. § 2C:58-3(c)(5), the police chief has broad discretion to deny a FPIC "[t]o *any person* where the issuance would not be in the interest of the public health, safety or welfare." (emphasis added.) This provision is intended to apply to cases in which an applicant does not fall within the statutorily enumerated disabilities, but the police chief still finds, in his or her judgment, that granting the applicant an FPIC would go against the "public interest." *In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M.*, 225 N.J. 487, 507 (N.J. 2016); *see also In re Osworth,* 838 *A.*2d 465, 460 (N.J. Sup. Ct. App. Div. 2003). Given this broad discretion vested in the police chief, the Court finds that Chey does not have a "legitimate claim of interest" in a FPIC for purposes of her procedural due process claim. *See Ass'n of New Jersey Rifle*, 850 F. Supp. 2d 455 at 460; *Hain*, 2010 WL 4514315, *6.

But even assuming arguendo that Chey has a "legitimate claim of interest" in a FPIC, the Court still finds that Chey is accorded sufficient due

process under New Jersey law. As an initial matter, the Court agrees with Chey that Chief LaBruno's failure to interview her prior to denying her FPIC application is contrary to New Jersey case law. For example, in *Weston v. State*, the New Jersey Supreme Court explained that while a police chief is not obligated "to hold a trial-type hearing before" denying an application, the applicant should have the "opportunity … to discuss the matter with the Chief, to be informed of the reasons for the denial and to offer any pertinent explanation or information for the purpose of meeting the objections being raised." 60 N.J. at 45. New Jersey courts have also stated that this pre-decision meeting is not only for the police chief to provide the reasons for denying a FPIC application, but to also "afford the applicant an opportunity to convince the chief, by submission of additional information and informal discussion, to change his [or her] decision, thus obviating the need for judicial review." *In re Dubov*, 981 A.2d 87, 94 n. 2 (N.J. Super. Ct. App. Div. 2009); *see also Matter of M.I.*, No. A-0910-20, 2022 WL 301720, at *5 (N.J. Super. Ct. App. Div. Feb. 2, 2022); *In re Rohani*, No. A-6249-12T4, 2015 WL 58889, at *3 (N.J. Super. Ct. App. Div. Jan. 2, 2015).

Chief LaBruno may have had legitimate concerns as a result of what had been reported to him by his officers, but he did fail to comply with the initial procedures articulated in *Weston.* We may even assume that his decision was erroneous, or in danger of being erroneous, because he had not afforded Chey an opportunity to explain.

As in the case of any allegedly erroneous permit decision, however, Chey had immediate recourse. Under N.J. Stat. Ann. § 2C:58-3(d), Chey had 30 days from her FPIC denial to serve Chief LaBruno with a written request for "a hearing in the Superior Court." And within 30 days of receipt of that request, Chey would have been absolutely entitled to a hearing, as of right, before the Superior Court. *Id.* ("The hearing *shall be held* and a record made thereof within 30 days of the receipt of the application for a hearing by the judge of the Superior Court.") At such a "de novo" hearing, Chey would have the

13

opportunity to introduce "relevant and material testimony and the application of an independent judgment to the testimony by the reviewing court." *Weston,* 60 N.J. at 45. Indeed, the *Weston* court found that such a hearing is *designed* to "compensate[] constitutionally for procedural deficiencies before the administrative official." *Weston,* 60 N.J. at 45 (citing *Jennings v. Mahoney*, 404 U.S. 25 (1971)); *see also Matter of M.I.*, No. A-0910-20, 2022 WL 301720, at *6 (N.J. Super. Ct. App. Div. Feb. 2, 2022); *Matter of W.R.'s Application for a Firearms Purchaser Identification Card (FPIC) & Handgun Purchase Permit (HPP)*, No. A-5426-16T1, 2019 WL 361643, at *3 (N.J. Super. Ct. App. Div. Jan. 30, 2019).

Chey, however, has not alleged that she appealed Chief LaBruno's denial to the Superior Court. This proves fatal to Chey's claim, as the Third Circuit has stated that "[i]f there is a process on the books that appears to provide due process," a plaintiff cannot ignore said "process and use the federal courts as a means to get back what [s]he wants." *Alvin*, 227 F.3d at 116 (citing *McDaniels v. Flick*, 59 F.3d 446, 60 (3d Cir. 1995)). Even if Chief LaBruno erred in not interviewing Chey before denying her FPIC application, Chey's "failure to pursue the available means of correction" cuts off her procedural due process claim. *Custin v. Wirths*, No. 2:12-CV-910-KM-MAH, 2020 WL 1466352, at *5 (D.N.J. Mar. 25, 2020), *aff'd*, 850 F. App'x 147 (3d Cir. 2021), *cert. denied*,142 S. Ct. 428 (2021).

Contrary to the Defendants' suggestion,[7] the Court declines to impose an exhaustion requirement. The Third Circuit has explained that the doctrine of exhaustion, which does not as such apply to a § 1983 claim, is "analytically distinct" from the procedural due process requirement that a plaintiff must avail herself of an available procedure that would satisfy due process standards. *Alvin*, 227 F.3d at 116. One cannot properly allege that the procedures the state provides were defective and fundamentally unfair if those

---

[7]    Defendants assert that Chey cannot "obtain federal review of her claim" because she has not "exhausted her administrative remedies." Mot. at 13.

procedures have not yet been tried. Nor can one gain the right to "appeal" a permit denial to federal court by the simple expedient of letting the deadline for state review lapse.

Accordingly, the Court finds that Chey has not plausibly alleged a procedural due process violation as to the denial of her FPIC application.

    *ii.*    *Seizure of Chey's Revolver*

The 2AC claims that on November 4, 2019, Chey reported "increased surveillance" to Lieutenant Green and subsequently disclosed that Mr. Antonucci had "gifted" her a Colt revolver. (2AC at ¶ 121.) Chey alleges that Green "induced" her to surrender the revolver to him for "safekeeping," and that he brought it to the MAPD station. (*Id.* ¶ 121.)[8] Despite former Chief Licata assuring Chey that she could retrieve the revolver "at any time," Chey claims that her requests for the return of her revolver have been ignored by MAPD. (*Id.* ¶¶ 122-123.) The 2AC therefore asserts that the seizure of her "lawfully possessed" revolver amounts to a violation of her due process, equal protection, Second Amendment, and Fifth Amendment rights. (*Id.* ¶ 124.)

Defendants argue that because Chey was denied a permit for a firearm, she never "lawfully" possessed the revolver. Therefore, they say, there is no legal basis for the MAPD to return "the firearm to [Chey], even if [this] Court were to determine that the MAPD refused to return the firearm." (Mot. at 14 (citing *In re Return of Weapons of J.W.D.*, 290 N.J. Super 451, 459 (N.J. Super. Ct. App. Div. 2019). Defendants also contend that that the "legal forfeiture" of the revolver, "pursuant to a mechanism which affords due process, does not constitute a constitutional taking." (Mot. at 14.)

I first clarify a few points. First, the allegations of the 2AC imply that Chey's FPIC application had not yet been denied at the time Lieutenant Green

---

[8]    The 2AC is not entirely clear as to whether Chey brought the revolver to the police station or Chey surrendered the revolver to Green at her home, with Green subsequently bringing the revolver to the station.

allegedly induced her to surrender her revolver.[9] Second, Defendants' claim that Chey did not "lawfully possess" the revolver because she did not have a handgun permit requires some refinement. Under N.J. Stat. Ann. § 2C:39-5(b), "any person who knowingly has in [her] possession any handgun … without first having obtained a permit to carry the same … is guilty of a crime of the second degree."[10] However, New Jersey law also states that N.J. Stat. Ann. § 2C:39-5 shall not be construed "to prevent a person keeping or carrying about the person's place of business, residence, premises, or other land owned or possessed by the person . . . ." N.J. Stat. Ann. § 2C:39-6(e). Therefore, as the New Jersey Supreme Court has commented, one may technically "possess an unlicensed handgun at home," although one may not elsewhere "carry a handgun without a permit." *State v. Petties*, 139 N.J. 310, 315 (N.J. 1995).

Nevertheless, the facts alleged in the 2AC suggest that Chey did not *lawfully acquire* the revolver in the first instance. The 2AC states that Mr. Antonucci gifted the revolver to Chey at a firing range in Pennsylvania. (2AC at ¶ 31.) Under Pennsylvania law, however, any individual who "is not a licensed importer, manufacturer, or dealer" can only transfer a firearm[11] "to another unlicensed person … upon the place of business of a licensed importer, manufacturer, dealer, or county sheriff's office." 18 Pa. Stat. Cons. Stat. Ann. § 6111(c).[12] Moreover, as to licensed importers, manufacturers, and dealers, 18

---

[9]     The 2AC does not explicitly state when Chey applied for the FPIC, although the complaint states that (1) there was a "six-month delay" in rendering and (2) MAPD denied her application on July 24, 2020, when "[l]eft with no plausible excuse to delay further." (2AC at ¶¶ 116-117.)

[10]     A "handgun" is defined as "any pistol, revolver, or other firearm originally designed or manufactured to be fired by the use of a single hand." N.J. Stat. Ann. § 2C:39-1(h).

[11]     Pennsylvania defines a "firearm" as "[a]ny pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches." 18 Pa. Stat. and Cons. Stat. Ann. § 6102.

[12]     Notably, this provision does not apply to the transfer of firearms "between spouses or to transfers between a parent and a child or to transfers between grandparent and grandchild." *Id.*

16

Pa. Stat. Cons. Stat. Ann. § 6111(b) sets forth numerous conditions in order to "sell or deliver any firearm to another person, other than a licensed importer, licensed manufacturer, licensed dealer or licensed collector." These Pennsylvania provisions demonstrate that based on the facts *currently alleged*, Chey unlawfully acquired the revolver.

With that background, I address Chey's constitutional claims. Chey first alleges that the "seizure" of her revolver violated her due process rights. The 2AC does not specify whether Chey is asserting a procedural or substantive due process challenge; I address both. As previously established, to state a procedural due process violation, Chey must allege that she possessed a liberty or property interest protected by the Constitution. *Bd. Of Regents*, 408 U.S. at 577. The Supreme Court in *District of Columbia v. Heller* held that the Second Amendment confers an individual right to keep and bear arms. 554 U.S. 570 (2008). Nonetheless, then Justice Scalia expressed that "the Second Amendment right is not unlimited," and that the court's opinion should not be taken to cast doubts "on longstanding prohibitions" such as laws "imposing conditions and qualifications on the commercial sale of arms." *Id.* at 627.[13]

To that end, New Jersey law classifies "firearms which are unlawfully possessed, carried, *acquired*, or used" as "prima facie contraband," thus (1) subject to forfeiture and (2) having no "property right" existing in them. *See* N.J. Stat. Ann. § 2C:64-1(a)(1). Because the 2AC's factual allegations reasonably suggest that Chey unlawfully acquired the revolver, Chey had no "property right" under New Jersey law. *Id.*; *cf. Mallard v. Potenza*, 376 F. App'x 132, 134 (2d Cir. 2010) (affirming judgment as to plaintiff's "due process claim based on the retention of his firearms, because plaintiff had no legitimate possessory interest in firearms for which he held no license.") Indeed, pursuant to N.J. Stat. Ann. § 2C:64-1b, "prima facie contraband," like an unlawfully

---

[13]    The Supreme Court subsequently held in *McDonald v. City of Chicago* that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*," which therefore applies to the states. 561 U.S. 742, at 791 (2010).

acquired revolver, "may be seized … without [ ] process … when not inconsistent with the [New Jersey] Constitution … or the United States."

Moreover, the Court finds that procedures available to Chey under New Jersey law were constitutionally adequate. It is undisputed that Chey willingly gave her revolver to MAPD. Therefore, MAPD only acquired the revolver without any pre-deprivation procedure because *Chey herself* voluntarily surrendered the weapon and not because MAPD confiscated the weapon pursuant to a court order, an arrest, or its police powers.

Nevertheless, Chey still had a post-deprivation remedy under New Jersey law to seek the return of the revolver. Under N.J. Stat. Ann. § 2B:50-1, Chey could pursue an action for replevin in order to seek the recovery of property "wrongfully held by [Defendants]." The 2AC makes no attempt to explain why "New Jersey's state procedures to recover wrongfully seized property, such as … replevin, are insufficient." *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 139 (3d Cir. 2010).[14] Indeed, the Third Circuit has stated than individual cannot prevail on a due process claim "if the state's post-deprivation procedures, including state tort remedies, are adequate." *Id.* Accordingly, the Court finds that Chey has not plausibly alleged a procedural due process violation.[15]

The Court now turns to the substantive due process claim. "Substantive due process is a component of the [Fourteenth Amendment] that protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Newark Cab. Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (alteration in original) (cleaned up). The Third Circuit has "recognized that two very different threads make up the

---

[14]    *See also Voellinger v. Dow*, A.3d 52, 55 (N.J. Sup. Ct. App. Div. 2011) (alternatively analyzing state Division of Criminal Justice's wrongful retention of property that it initially was entitled to possess as a bailment, permitting recovery if at least gross negligence shown).

[15]    *See Abdur-Raheem v. New Jersey Dep't of Corr.*, No. CV151743MASTJB, 2017 WL 1050581, at *16 (D.N.J. Mar. 20, 2017) ("[E]ven accepting Plaintiff's allegations as true, there was no due process violation because Plaintiff had an independent and adequate post-deprivation remedy available to [her] under state law.")

fabric of substantive due process: substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Id.* (cleaned up). Chey attempts to state a non-legislative substantive due process claim. To state such a claim, Chey must allege she has "a property interest protected by the substantive due process clause, and the government's deprivation of that protected interest shocks the conscience." *Joey's Auto Repair & Body Shop v. Fayette Cnty.*, 785 F. App'x 46, 49 (3d Cir. 2019) (cleaned up).

Leaving aside the property element, Chey has not established that MAPD's "seizure" of her revolver shocks the conscience. The Supreme Court has expressed a high bar for such claims and, as the New Jersey Supreme Court has noted, "the collective conscience of the United States Supreme Court is not easily shocked." *Rivkin v. Dover Twp. Rent Leveling Bd.*, 143 N.J. 352, 366 (1996); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). What is conscience-shocking depends on context, *see United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 399-400 (3d Cir. 2003), and whether an incident "shocks" the conscience" is ultimately a question of law. *See Rochin v. California*, 342 U.S. 165, 172 (1952).

As previously stated, the property deprivation Chey alleges can be remedied under New Jersey law. Chey's predicament can hardly be characterized as "conscience-shocking when New Jersey has given [Chey] the means to correct the erroneous deprivation [s]he alleges." *Ford v. Cassella*, No. CIV.A. 10-3711 JBS, 2011 WL 3203285, at *5 (D.N.J. July 27, 2011) (citing *Mora v. City of Gaithersburg, Maryland,* 519 F.3d 216, 231 (4th Cir. 2008)). The Court therefore finds that Chey has not stated a substantive due process claim.

Finally, the Court finds that MAPD's "seizure" of the revolver did not amount to a Fifth Amendment taking. The Takings Clause provides that "private property [shall not] be taken for public use, without just

compensation." U.S. Const. amend. V.[16] The Court is tasked with a two-step process in assessing a takings claim: First, the Court must determine whether the plaintiff has asserted a "legally cognizable property interest." *Park Restoration, LLC v. Erie Ins. Exch.*, 855 F.3d 519, 526 (3d Cir. 2017) (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428–29 (3d Cir. 2004)). Second, the Court evaluates plaintiff's claim that her property was taken, asking: "(1) was there a taking?; (2) was that taking for public use?; (3) did the claimant receive just compensation?" *Id.* at 525.

Even assuming Defendants' actions constituted a "taking" of Chey's property interest, the 2AC does not allege or explain how the seizure of her revolver constitutes a taking for "public use." Indeed, the 2AC alleges that Chey surrendered the revolver to Sergeant Green in order to deter "further attack[s]" against Chey to retrieve the weapon. (2AC at ¶21.)[17] Therefore, the Court dismisses the 2AC's Fifth Amendment taking claim.[18]

       *iii.*    *Unlawful Search of Chey's Residence*

The 2AC alleges that on November 8, 2019, at around 2 am, Defendant Sergeant Coupe and another MAPD patrol officer arrived at Chey's home "in response to an intruder alarm." (*Id.* ¶ 125.) Chey alleges that "while [Coupe was] inspecting the lower level," he "intentionally caused two deadbolts on French doors ... to become unsecured"; this, she says, can only be done from

---

[16]     The Takings Clause applies to state and local governments through the Fourteenth Amendment. *Chicago, B & Q R., Co. v. City of Chicago*, 226, 241 (1897).

[17]     Nor is the State's retention of contraband properly considered a "taking" of private property.

[18]     The 2AC also alleges that the "seizure" of the revolver violated Chey's rights to equal protection under the law. 2AC at ¶ 124. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, [Chey] must prove the existence of purposeful discrimination…. [Chey[ must demonstrate that [she] received different treatment from that received by other individuals similarly situated." *Holley v. Port Auth. of N.Y. & N.J.*, No. 3:14-CV-7534-BRM-DEA, 2018 WL 4953008, at *2 (D.N.J. Oct. 12, 2018) (quoting *Chambers ex rel. Chambers v. Sch. Dist. Of Phila.*, 587 F.3d 176, 196 (3d. Cir. 2009)). The 2AC, however, does not provide any allegations or facts suggesting that the "seizure" was the product of purposeful discrimination against Chey.

the inside, which is possibly the basis for her allegation that Coupe entered her home. This, she says, is further confirmed by her analysis of "shadow patterns." (*Id.* ¶¶ 126, 130.)[19]

Chey also contends that Sergeant Coupe told her that "her French doors were in a blind spot for her ADT security cameras," which Chey believes demonstrates that Coupe had been (1) surveilling her home "for weaknesses in its security systems" and (2) "disabling and unsecuring an ingress point within" the blind spot in her home. (*Id.* ¶ 129.) In short, she alleges that Coupe had the intention to enable, not prevent, access to her home by an intruder. Defendants respond that Chey's allegations are conclusory and that Chey's alleged actions do not constitute a search or seizure. (Mot. at 15.)

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures inside someone's home … are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006) (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*, 445 U.S. 573, 586 (1980).

I find Chey's Fourth Amendment claim to be both unclear and conclusory. As an initial matter, the 2AC is bereft of facts concerning any alleged unauthorized entry onto Chey's property or into Chey's residence. Notably, the 2AC does not: (1) allege that Coupe or the MAPD patrol officer entered her home without authorization; (2) provide any detail as to whether Coupe sought Chey's consent to enter her home, and if so, whether Chey denied consent; (3) provide facts as to how Coupe violated any right by subsequently "inspecting the lower level" of her locked home, whether from inside or outside; or (4) allege that any action Sergeant Coupe performed in

---

[19]   The 2AC also asserts that her (1) "basement window that had been screwed shut and physically blocked since September of 2010 was opened" and that (2) the "window alarm contact was also disabled and failed to sound the ADT siren." (2AC at ¶ 128.)

Chey's home occurred without her consent. Boiled down, the allegation seems to be that Sergeant Coupe did a security check in response to a burglar alarm, and left the French doors unbolted, with no consequences resulting—not the stuff of a constitutional violation.

Although Chey's complaint is not required to contain detailed factual allegations, she is required to provide sufficient factual allegations which allow the Court "to draw the reasonable inference that that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Without such facts, the Court, at this juncture, cannot find that Coupe conducted an unconstitutional search of Chey's home or property.[20]

Accordingly, the Court will grant Defendants' motion to dismiss as to the 2AC's Fourth Amendment claim.

### 2. *Monell* Claims Against Mount Arlington (Count 3)

---

[20]    Even assuming that Sergeant Coupe performed an impermissible warrantless search (which the 2AC does not allege), case law and the limited facts alleged suggest that such a search would fall under the exigent circumstances exception. For a warrantless search to be found constitutional, "there must be probable cause and such other circumstances [as] would cause a reasonable person to believe that the exigencies of the situation made that course imperative." *United States v. Wolfe*, 452 F. App'x 180, 183 (3d Cir. 2011) (citations omitted). Exigent circumstances "include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006); *see also Parkhust v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) ("[T]o qualify as exigent, the officers reasonably must believe that someone is in imminent danger.") Under the Fourth Amendment, an action is reasonable "as long as the circumstances, viewed *objectively*, justify [the] action." *Quinn v. Cintron*, 629 F. App'x 397, 399 (3d Cir. 2015) (emphasis added) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (internal quotation marks omitted).

The 2AC alleges that Sergeant Coupe and the MAPD patrol officer responded to an intruder alarm at 2 am. (2AC at ¶ 125.) Federal courts have routinely found exigent circumstances when a police officer has performed a warrantless search of a private residence in response to an activated intruder alarm. *See, e.g., United States v. Brown*, 449 F.3d 741, 750 (6th Cir. 2006); *Hunter v. Trussel*, No. 2:03-CV-00972, 2006 WL 1209374, at *6 (S.D. Ohio May 2, 2006); *United States v. Dighera*, 2 F. Supp. 2d 1377, 1379 (D. Kan. 1998). The Court believes that the triggered intruder alarm, the early morning hour at which the alarm was triggered, and Chey's prior claims of being harassed and attacked in her home reasonably would have justified the officers' entry onto the property or into the home, on the plaintiff-favorable assumption that something like that occurred.

Chey asserts that there is municipal liability flowing from her constitutional § 1983 claims. For constitutional torts, municipalities and local governments cannot be held liable on a *respondeat superior* theory. Instead, municipal liability for the acts of municipal employees must be premised on the doctrine of *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978). *See Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013). The "official policy" requirement in *Monell* "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible"—acts, in other words, which municipality "has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (emphasis in original).

To establish a prima facie case for *Monell* liability, Chey must "(i) demonstrate the existence of an unlawful policy or custom; (ii) that resulted in a deprivation of the rights, privileges, or immunities secured by the Constitution or laws of the United States; and (iii) that the policy or custom was the proximate cause of the alleged deprivation." *Maldonado v. City of Passaic Bd. Of Educ.*, No. CV1712245ESJAD, 2020 WL 289649, at *7 (D.N.J. Jan. 21, 2020) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A government policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Bielevicz*, 915 F.2d 845, 850 (3d Cir. 1990)). In contrast, "a course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Id.*

Chey alleges that the "[Mount Arlington] implemented an unconstitutional policy and custom to violate [her] civil liberties, deprive her right to bear arms for immediate protection, seize her property under false

pretenses, disregard offenses to her person and property, fabricate police reports (at least in part), intimidate her counsel, excuse the likely perpetrator and favor insiders of [Mount Arlington]." (2AC at ¶ 142.) For example, the 2AC contends that MAPD has initiated "practices of denigrating, dismissing, and disregarding patent dangers and threats to [Chey] since at least 2014 so as to have become permanent and well settled as to virtually constitute law in [Arlington]." (*Id.* ¶ 143.) The 2AC claims that Arlington established this policy "rooted in discrimination" and which has resulted in the violation of her constitutional rights. (*Id.* ¶¶ 143, 145.)

The Court finds that Chey has not documented an official municipal policy, such as a proclamation, policy, or edict that resulted in her alleged injuries. Neither has Chey sufficiently alleged a *de facto* policy or practice establishing *Monell* liability. Although Chey takes issue with MAPD's response to her complaints and alleged injuries "since at least 2014," the 2AC does not provide factual support for her proposition that these incidents are expressive of some general MAPD policy. Most seem to consist of little more than her imputation of nefarious purposes to the police who were performing routine caretaking functions, often in response to Ms. Chey's own complaints or requests. Nor does Chey point to any other comparable situations or incidents in which the MAPD's alleged practices resulted in injuries to other individuals.

The Court therefore grants Defendants' motion to dismiss as to the 2AC's *Monell* claim against Mount Arlington.

### 3. RICO Claims (Count Eleven)

The 2AC brings a RICO claim under 18 U.S.C. § 1962(c) and (d) against "all Defendants." Section 1962, however, is a criminal statute that does not contain a civil cause of action for damages. Reading the 2AC liberally, the complaint likely intends to assert a civil RICO claim under 18 U.S.C. § 1964. Pursuant to 18 U.S.C. § 1964, the federal RICO statute provides for recovery by any person injured in his or her business or property by reason of a violation of § 1962.

24

To state a claim under § 1964(c), Chey must plead "(1) a section 1962 violation and (2) an injury to business or property by reason of such injury." *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993). Here, the 2AC asserts a violation of section 1962(c) and (d) against "all Defendants," alleging that the "Defendants have and are working together such as to comprise an enterprise." (2AC at ¶ 275.) Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362–63 (3d Cir. 2010). Section 1962(d) makes it unlawful "for any person to conspire to violate" § 1962(c).

To state a claim under § 1962(c), Chey must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482–83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518–19 (D.N.J. 2011) (citation omitted). The Court finds that Chey has not stated a claim under § 1962(c) because she has not plausibly alleged that the Defendants constituted an "enterprise." RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise therefore may take the form of either a formal legal entity or an informal association-in-fact. *United States v. Turkette*, 452 U.S. 576 581-82 (1981). The 2AC appears to allege an informal association-in-fact enterprise.

The Supreme Court has held that an association-in-fact enterprise must have, at minimum, the following three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Further, the Third Circuit has held that a plaintiff

25

must explicitly plead these three features to plausibly allege an association-in-fact enterprise. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 364-70 (3d Cir. 2010.) Applying these principles to the instant action, the 2AC's allegation that the "Defendants have and are working together such as to comprise an enterprise" falls short of establishing an association-in-fact enterprise. Chey has only stated a legal conclusion and has not provided facts "that would permit the plausible inference that the … Defendants were in any way associated with each other." *N.V.E., Inc. v. Palmeroni*, No. CV 06-5455, 2015 WL 13649814, at *7 (D.N.J. Feb. 23, 2015).[21]

Finally, because the 2AC has failed to establish a substantive RICO claim, the RICO conspiracy claim under § 1962(d) similarly fails. *See Verify Smart Corp. v. Bank of Am., N.A.*, No. CV174248JMVJBC, 2021 WL 2549335, at *16 (D.N.J. June 17, 2021) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993)).

### 4. Constitutionality of N.J. Admin. Code § 13:54-1.15 (Count 2)

Finally, the 2AC asserts a facial constitutional challenge against N.J. Admin. Code § 13:54-1.15. That provision states as follows:

> Any background investigation conducted by the chief of police, the Superintendent or the county prosecutor, of any applicant for a permit, firearms identification card license, or registration, in accordance with the requirements of this chapter, is not a public record and shall not be disclosed to any person not authorized by law or this chapter to have access to such investigation, including the applicant. Any application for a permit, firearms identification card, or license, and any document reflecting the issuance or denial of such permit, firearms identification card, or license, and

---

[21]    To the extent the 2AC claims that Mount Arlington, the MAMC, and the MACD are members of the alleged enterprise, the Court notes that municipal entities are not subject to suit under RICO. *See JDM Grp., LLC v. Passaic Valley Water Comm'n*, No. CV 18-14028 (JMV), 2019 WL 6606967, at *5 (D.N.J. Dec. 4, 2019) (*Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3d Cir. 1991) (stating that "the prevailing nature of section 1964(c)'s compulsory award of treble damages convinces us that Congress, in keeping with the common law, did not intend to subject municipal corporations to RICO liability.")

any permit, firearms identification card, license, certification, certificate, form of register, or registration statement, maintained by any State or municipal governmental agency, is not a public record and shall not be disclosed to any person not authorized by law or this chapter to have access to such documentation, including the applicant, except on the request of persons acting in their governmental capacities for purposes of the administration of justice.

Chey alleges that she submitted requests, pursuant to New Jersey's Open Public Records Act ("OPRA"), N.J. Stat. Ann. §§ 47:1a-1 *et seq.*, for (1) "a copy of the file investigational and for [FPIC] denials within the prior year" and (2) "a copy of the source document[s] upon which [Chief LaBruno] relied on" in denying Chey's FPIC application. (2AC at ¶¶ 131-132.) Chief LaBruno denied Chey's two requests citing N.J. Admin. Code § 13:54-1.15. (*Id.* ¶ 133.)

According to Chey, the challenged provision "precludes any meaningful opportunity to ascertain whether MAPD (or any police agency) is operating in an arbitrary, capricious, or discriminatory fashion." (*Id.* ¶ 135.)  Chey also argues that the provision unduly inhibits an individual's right "to apply to revoke" another individual's FPIC pursuant to N.J. Stat. Ann. § 2C:58-3(f). (*Id.* ¶ 136.) Therefore, Chey claims that the provision "violates due process and equal protection." (*Id.* ¶ 138.)[22]

The Court proceeds to address Chey's Equal Protection and Due Process arguments.

### i.   *Equal Protection Challenge*

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In reviewing an Equal Protection claim, a court must first determine whether the alleged state action burdens a fundamental

---

[22]   Although Defendants construe Count 2 as challenging the constitutionality of N.J. Admin. Code § 13:54-1.15 under the New Jersey constitution, the Court interprets Count 2 as being a federal constitutional challenge given the complaint's reference to "liberty interests" and rights guaranteed under the United States Constitution. *See* 2AC at ¶ 135.

constitutional right or targets a suspect class." *ASAH v. N.J. Dep't of Educ.*, 330
F. Supp. 3d 975, 1007 (D.N.J. 2018) (internal quotation omitted) (citing *State
Troopers Non-Commissioned Officers Ass'n of N.J. v. New Jersey*, 399 F. App'x
752, 754 (3d Cir. 2010)). "If a classification neither burdens a fundamental
right nor targets a suspect class, [the Court] will uphold it so long as it bears a
rational relation to some legitimate end." *Connelly v. Steel Valley Sch. Dist.*, 706
F.3d 209, 213 (3d Cir. 2013), *as amended* (May 10, 2013) (internal quotations
omitted) (citing *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)).
"However, a classification [that] trammels fundamental personal rights or is
drawn upon inherently suspect distinctions such as race, religion, or alienage
... must meet the strict scrutiny standard, under which a law must be narrowly
tailored to further a compelling government interest." *ASAH*, 330 F. Supp. 3d
at 1007-08 (citing *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992))
(internal quotation omitted) (alteration in original).

The question may initially be viewed through the lens of standing. Chey
states that she wants to check whether the permitting requirements are being
applied to others in an arbitrary fashion. She also believes the law inhibits
people from applying to revoke the firearms permits of others. (2AC ¶¶ 135,
136) Neither claim implicates her own interests. I set that aside, however, and
consider the merits, which fail for related reasons.

Here, Chey does not specifically allege that she is a member of a suspect
class based on factors such as race, alienage, religion, or national origin. As for
the fundamental right at issue, the 2AC claims that the challenged provision
resulted in the violation of her "fundamental liberty interest in equal protection
and the presumption of her Second Amendment" rights. (2AC at ¶ 135.) Chey,
however, does not explain why her inability to access (1) documents bearing on
the police chief's background investigation into an FPIC application or (2)
documents reflecting the issuance or denial of an FPIC application burdens the
Second Amendment right. Indeed, the 2AC seems to be claiming only that the

provision inhibited her from ascertaining the status of other individuals' FPIC applications under New Jersey law. (*Id.* ¶¶ 136-137).

The Court does not believe that the challenged provision makes it any *less likely* that the police chief will deny an FPIC application, whether Ms. Chey's or anyone else's; instead, the provision only prohibits the public from *accessing* (1) the police chief's investigatory documents bearing on whether an applicant is qualified for a FPIC or (2) the FPIC itself. However, as the Supreme Court has noted, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED*, 438 U.S.1, 15 (1978).

Rational basis is therefore the appropriate level of scrutiny to apply to the challenged provision. "While the rational basis test is not a toothless one, the defendant need only demonstrate that the act is rationally related to some legitimate governmental purpose." *ASAH*, 330 F. Supp. 3d at 1012 (internal quotations and citations omitted). In promulgating N.J. Admin. Code § 13:54-1.15, the Attorney General of New Jersey expressed that the provision's purpose "is to protect the privacy of holders of firearms and to protect those same individuals, as well as the general public, from being victimized by criminal elements." 27 N.J. Reg. 305 (Jan. 17. 1995). The Attorney General also explained that "exempting permits, [FPICs], [and] licenses … from being classified as public records will deny … [criminals] the opportunity of obtaining 'shopping lists' of names and addresses of persons who own firearms"—therefore protecting firearms holders from being targeted for burglary and theft.[23] Finally, the provision was designed to protect "privacy because

---

[23]     *Id.*; *see also S. New Jersey Newspapers, Inc. v. Twp. of Mt. Laurel*, 141 N.J. 56, 75 (1995) (recognizing that the government's interest included "maintaining the confidentiality of personal information in an applicant's investigative file, preventing increased black-market sales of unregistered firearms, ensuring the candor of an applicant and his or her references, denying the criminal elements in our society the opportunity of obtaining  'shopping lists' of names and addresses of persons who own

background investigations include such subjects as medical and mental disabilities, alcoholism, drug addition," and other sensitive matters not appropriate for public disclosure. 27 N.J. Reg. 305 (Jan. 17. 1995).

Chey fails to identify what level of scrutiny N.J. Admin. Code § 13:54-1.15 should be analyzed under or explain why the provision fails to pass constitutional muster under the appropriate level of scrutiny. Nonetheless, the Court believes that N.J. Admin. Code § 13:54-1.15 is rationally related to the New Jersey's legitimate government interests. Therefore, I find that the Chey has failed to state a claim that N.J. Admin. Code § 13:54-1.15 violates the Equal Protection Clause.

> ii.   *Due Process Challenge*

The Due Process Clause prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The 2AC does not state whether N.J. Admin. Code § 13:54-1.15 violates procedural or substantive due process. The Court will again address both components of due process.

As previously established, to state a claim for procedural due process, Chey must allege that (1) she had a property interest protected under the Fourteenth Amendment; and (2) the procedures provided to her were constitutionally inadequate. *See Alvin,* 227 F.3d at 116 (3d Cir. 2000). The 2AC does not allege that the documents governed by N.J. Admin. Code § 13:54-1.15 are property interests protected under the Fourteenth Amendment. Nor could Chey make such an argument, as the Fourteenth Amendment does not "mandate a right of access" to government records. *Houchins*, 438 U.S. at 15. Therefore, Chey cannot be said to have the "legitimate claim of entitlement" needed to establish a property interest for purposes of her procedural due process claim. *See Bd. Of Regents*, 408 U.S. at 577.

---

firearms, and decreasing the chilling effect of public disclosure on qualified persons who wish to purchase a firearm.")

And with respect to substantive due process, "substantive due process challenges to a legislative or regulator act are reviewed under a rational basis test." *ASAH*, 330 F. Supp. 3d at 1012 (citing *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012)). The Court has already found that N.J. Admin. Code § 13:54-1.15 is rationally related to New Jersey's legitimate interest in protecting the privacy "of holders of firearms and to protect those same individuals, as well as the general public, from being victimized by criminal elements." 27 N.J. Reg. 305 (Jan. 17. 1995).

Accordingly, the Court finds that Chey has failed to state a claim for either a procedural or substantive due process violation. Because the Court has determined that the 2AC does not state a claim that N.J. Admin. Code § 13:54-1.15 violates either the Equal Protection or Due Process Clauses, the Court grants Defendants' motion to dismiss as to Count 2.

### B. Supplemental Jurisdiction

Having dismissed Chey's federal claims, the Court must consider whether to exercise supplemental jurisdiction over Chey's remaining state-law claims, pursuant to 28 U.S.C. § 1367(c)(3).

Under 28 U.S.C. § 1367(c), the Court has discretion to decline jurisdiction over the remaining state-law claims after all federal-law claims have been dismissed from the action. The Third Circuit has held that where the federal claims that formed the basis for original jurisdiction are dismissed, a "district court may decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995); *see also Shaffer v. Bd. Of Sch. Dirs. Of Alber Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (holding that "pendent jurisdiction should be declined where the federal claims are no longer viable, absent extraordinary circumstances"). In short, the presumptive rule is that the state claims shall be dismissed, unless reasons of economy and fairness dictate otherwise.

31

Where the case has been substantially litigated, it may be a proper exercise of jurisdiction to retain the state-law claims. *See Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1284-85 (3d Cir. 1993) (remanding the exercise of discretion as to whether to retain pendant claim, noting that where the district court already heard all evidence necessary to decide the state contract claim, it might retain jurisdiction) On the other hand, where the case is nowhere close to trial, dismissal or remand is likely the proper course. *Freund v. Florio*, 795 F. Supp. 702, 710 (D.N.J. 1992) ("[A]t this earl stage in litigation, dismissal of the pendant state claims in a federal forum will result in neither a waste of judicial resources nor prejudice to the parties.").

No such extraordinary circumstances or considerations of efficiency and fairness are present here. This action is in its infancy, at the motion to dismiss stage. There is no particular procedural disadvantage to having a state court hear these state-law claims. The federal claims having been dismissed, the Court will exercise its discretion to decline supplemental jurisdiction over Chey's remaining state-law claims. Counts 4-7 and 9-10 of the 2AC will be dismissed without prejudice for lack of subject matter jurisdiction. Lacking jurisdiction, I do not reach the Defendants' substantive arguments as to whether the state-law counts state a claim upon which relief may be granted.

### C. Preliminary and Permanent Injunctive Relief

Because the Court has dismissed Chey's federal-law claims for failure to state a claim upon which relief can be granted and declines to exercise supplemental jurisdiction over the remining state-law claims, the 2AC's request for preliminary and permanent injunctive relief will also be denied.

### IV.    Conclusion

For the reasons set forth above, I will **GRANT** Defendants' motion (DE 26) to dismiss the action. The dismissal of Chey's federal claims is without prejudice to the filing of a motion to amend, accompanied by a proposed Third Amended Complaint, within 30 days. If no such motion is filed, this dismissal will be final. Because all state-law claims are dismissed on jurisdictional

grounds, the dismissal of state claims is entered without prejudice to their assertion in any forum which does possess jurisdiction. Should an amended complaint state viable federal claims, however, the Court may reconsider the dismissal of state-law claims for lack of supplemental jurisdiction.

An appropriate order will be entered.

Dated: June 17, 2022

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**